IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| | * | |
| MALCOM HOLLENSTEINER, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 10-cv-00200-AW |
| | * | |
| WATERFIELD GROUP, *et al.*, | * | |
| Defendants. | * | |
| | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Memorandum Opinion**

There are two matters currently before the Court: (1) a motion to dismiss filed by

Defendant Affinity Financial Corporation d/b/a Waterfield Group ("Waterfield Group"), Doc.

No. 21, and (2) the Federal Deposit Insurance Corporation ("FDIC")'s motion to substitute itself

for Waterfield Bank as the real party-in-interest, Doc. No. 23. The Court has reviewed the

motion papers submitted by the Parties and finds that no hearing is necessary. *See* Loc. R. 105(6)

(D. Md. 2010). For the reasons articulated below, the Court will grant FDIC's motion to

substitute and deny Waterfield Group's motion to dismiss. Furthermore, upon reviewing the

docket, it appears that one of the named Defendants, David Brown, has not been served with

process. Thus, the Court will order Plaintiff to show cause, within fourteen days, why the

Complaint should not be dismissed as to Brown.

I.      **Factual & Procedural Background**

The following facts are drawn from the Complaint except when otherwise noted. Plaintiff

Malcolm Hollensteiner was employed as a senior vice president and manager of retail mortgage

banking at Waterfield Bank ("Bank")'s former office in Bethesda, Maryland from around August

1

2008 until July 2009. The Complaint names three Defendants: the Bank, Waterfield Group, and David Brown, the chief executive officer of the Bank. The Complaint alleges that all three Defendants were "the employer of Plaintiff within the meaning of the Maryland Wage Payment and Collection Act." Compl. ¶¶ 8-10. Beyond these general allegations, the Complaint does not describe the nature of Plaintiff's relationship with each Defendant or specify which of the allegedly wrongful actions were committed by each Defendant. Instead, it refers collectively to actions of the "Defendants." *E.g.*, *id.* ¶ 12. For now, the Court will do the same; at the end of this section, however, the Court will summarize Plaintiff's post-Complaint efforts to articulate a specific basis for liability as to Waterfield Group.

Around July 2008, Plaintiff was approached by Defendants with an opportunity to join the Bank's Bethesda office. Defendants promised him that in this role, his primary responsibility would be to manage all aspects of new retail mortgage loans. Ordinarily, this task would involve developing loan packages, arranging deals, pricing new loans, and analyzing competitive strategies within the market.

The Parties completed their negotiations around July 23 and executed an employment agreement. *See* Compl., Ex. A ("Agreement"). In addition to Plaintiff's ordinary compensation, the Agreement guaranteed that upon termination without cause, he would receive a severance payment. The severance benefit was set to expire one year after the start of Plaintiff's employment, on August 6, 2009.

Furthermore, the Agreement provides that "'in all events [Plaintiff's] position shall be consistent with a senior level executive of the Bank.'" Compl. ¶ 21 (quoting Agreement ¶ 1). Until July 2009, Plaintiff's duties were equivalent with those of a senior-level executive, and he was never asked to perform administrative or operational duties.

However, on July 16, the Bank informed its employees, including Plaintiff, that they were not to provide any new mortgage loans in the East or Southeast lending offices, and that those functions would be moved to the Irvine, California corporate offices. Soon thereafter, the Bank formally notified all loan originators, all of whom were supervised by Plaintiff, that their employment was terminated. Unlike Plaintiff, none of these loan originators had an employment contract or severance benefit. This left Plaintiff with no employees to manage.

Nonetheless, Defendants delayed providing Plaintiff with a formal termination notice. The Complaint suggests a reason for this delay: "to evade their obligation to make Plaintiff's required severance payment, which was set to expire on August 6, 2009." *Id.* ¶ 38.

Plaintiff advised the Bank of his belief that he had been effectively terminated, and he requested an update on the status of his severance payment. The Bank responded by giving him a new set of clerical duties that were, in his view, not consistent with the Agreement's promise that he would be given duties equivalent to those of a senior-level executive. Because the Agreement required that Plaintiff maintain his position with the Bank after receiving a notice of termination as a condition for receiving his severance payment, he performed the assigned duties. Nonetheless, Defendants never provided him a severance payment.

Plaintiff brought this action for violations of the Maryland Wage Payment and Collection Law ("MWPCL"), MD. CODE ANN., LAB. & EMPL. §§ 501-09, breach of contract, promissory estoppel, and *quantum meruit*. FDIC has filed an unopposed motion to substitute itself in place of the Bank as the real party-in-interest, because the Bank has shut down and appointed the FDIC as its receiver. *See* Doc. No. 23. Waterfield Group has moved to dismiss, primarily on the ground that the Complaint fails to specify which, if any, of the undifferentiated allegations against the "Defendants" it is responsible for. *See* Doc. No. 21.

Although the Complaint itself does not provide any facts specifically linking Waterfield Group to any wrongful actions, several other documents clarify the relationships between Waterfield Group, the Bank, and Plaintiff. The first is the Agreement, which is attached to and therefore part of the Complaint. On the one hand, aspects of the Agreement support Waterfield Group's story that Plaintiff's employment relationship is solely between him and the Bank: the Agreement appears on the Bank's letterhead, and it states that the offer for employment is extended "by Waterfield Bank." Agreement at 1.

On the other hand, Waterfield Group (referred to as "Company" in the Agreement) is mentioned at several important junctures. Plaintiff may participate in "the Company's Stock Option Plan," "subject to the Company's Board's approval," and the exercise price of the options is based on "the value of the Company's shares." *Id.* ¶ 4. Any such stock options "shall vest and become fully exercisable" prior to the dissolution or merger of "the Company or the Bank." *Id.* Furthermore, the Agreement provides that Plaintiff is entitled to severance payments if he is terminated without cause upon a change of shareholder control in *either* the Bank *or* the Company. *See id.* ¶ 5(b). The Agreement also conditions Plaintiff's eligibility for severance payments on execution of "a release of all claims against the Bank, the Company," and others. *Id.* ¶ 5(e). The Agreement authorized Plaintiff to participate in Company-sponsored pension plans, "including 401(k) and other employee plans and benefits established by the Company or the Bank." *Id.* ¶ 6. Plaintiff was instructed that he must "act in the best interests of the Bank and the Company," *id.* ¶ 9, and the Agreement states that "[y]our employment will be subject to various Company and Bank policies and guidelines," *id.* ¶ 14.

The other document that supplies evidence regarding Plaintiff's relationship with Waterfield Group and the Bank is Waterfield Group's proposed Severance Agreement and

General Release, which was not attached to the Complaint, but rather to Plaintiff's opposition to Waterfield Group's motion to dismiss. *See* Doc. No. 24, Ex. B ("Severance Release"). The opening paragraph indicates that the agreement is between Waterfield Group (referred to as "Affinity") and Plaintiff. *See id.* ¶ 1. Throughout the document, Plaintiff is referred to as "Employee." *E.g.*, *id.* The document states that "Employee's employment with Affinity will terminate on September 25, 2009," on which date "Affinity shall pay Employee all compensation and any accrued vacation . . . owed to Employee as of the Termination Date." *Id.* ¶ 2(a). In total, "Affinity shall pay to Employee $23,076.93." *Id.* ¶ 2(b).

However, by signing the Severance Release, Plaintiff would indicate that he "understands that absent the signing of this Agreement, he would not otherwise be entitled to this Severance Payment." *Id.* Furthermore, Plaintiff's signature would "completely release and forever discharge Affinity . . . from all claims . . . which Employee may now have . . . arising from or in any way connected with the employment relationship between the parties." *Id.* ¶ 3.

Finally, Plaintiff's opposition memorandum raises several new facts that are neither included in the Complaint nor in any exhibit. Plaintiff states that the Bank was purchased by Waterfield Group in 2008 as "a wholly-owned subsidiary . . . that was at least partly run from [Waterfield Group's] central office in Irvine, CA." Doc. No. 24 at 11. At the time of Plaintiff's employment, the two entities "shared members of their respective Boards of Directors," and the Bank's president was located in Irvine. *Id.* at 12. Although Plaintiff worked in Maryland, "many of his job responsibilities either ran through or were coordinated with Affinity's office in Irvine," and he was "constantly in contact with the Irvine office and worked with [Waterfield Group] to partner the Bank with particular clients of [Waterfield Group] in furtherance of [Waterfield Group's] overall business strategy." *Id.* at 11-12. Initially, Waterfield Group supported and

expanded the Bank's mortgage business, but when Plaintiff's mortgage group was shut down, "all of the group's former functions were moved to [Waterfield Group's] headquarters in Irvine." *Id.* at 12. Lastly, Waterfield Group cut Plaintiff's paychecks during his employment with the Bank and mailed them from the Irvine office.

## II. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, the complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

In its determination, the Court must "accept the well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in the light most favorable to the plaintiff," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court should not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), "legal conclusion[s] couched as . . . factual allegation[s]," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

In resolving a motion to dismiss, the Court should proceed in two steps. First, the Court should determine which allegations in the Complaint are factual allegations entitled to deference,

and which are mere legal conclusions that receive no deference. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

### III.    Analysis

### A. FDIC's motion to substitute

FDIC moves, without opposition, to substitute itself for the Bank pursuant to Rule 25(c) of the Federal Rules of Civil Procedure, which allows for the substitution of one party for another when "an interest is transferred." *See* Doc. No. 23. The Federal Deposit Insurance Act allows the FDIC to accept appointment as receiver for an insured depository institution. *See* 12 U.S.C. § 1821(c). When it does so, it succeeds to "all rights, titles, powers and privileges" of the bank, § 1821(d)(2)(A)(i), which includes the resolution of outstanding claims against the bank, § 1821(d)(3). On March 5, 2010, the Office of Thrift Supervision closed the Bank and duly appointed the FDIC as receiver. *See* Doc. No. 23, Ex. A. Under these circumstances, it is appropriate to substitute the FDIC for Waterfield Bank, and the motion will be granted.

### B. Waterfield Group's motion to dismiss

In its motion to dismiss, Waterfield Group raises two arguments. First, it urges dismissal of all counts against it on the ground that Plaintiff has failed to allege facts sufficient to establish the existence of an employment relationship. Second, it contends that Plaintiff's *quantum meruit* claim should be dismissed because quasi-contractual remedies are only available "'where, in

fact, there is no contract.'" *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F.

Supp. 2d 785, 792 (D. Md. 2002) (quoting *Cnty. Comm'rs v. J. Roland Dashiell & Sons, Inc.*,

747 A.2d 600, 606 (Md. 2000)). The Court will address these questions in reverse order.

### 1. *Quantum meruit*

Plaintiff's *quantum meruit* claim should not be dismissed, because his opposition

memorandum clarifies that the contract and quasi-contract claims are pled in the alternative.

Defendant is correct that Plaintiff cannot ultimately recover on both theories, but the Federal

Rules of Civil Procedure permit Plaintiff to allege alternative theories of liability. *See, e.g.*, *id.*

("[A]lthough [the plaintiff] may not recover under both contract and quasi-contract theories, it is

not barred from pleading these theories in the alternative where the existence of a contract

concerning the subject matter is in dispute."); *see generally* Fed. R. Civ. P. 8(d)(3) ("A party

may state as many separate claims or defenses as it has, regardless of consistency."). Thus, count

five will not be dismissed.

### 2. Employment relationship

Before reaching the merits of the Parties' dispute regarding the existence of an

employment relationship, a threshold question must be resolved: which documents may be

considered by the Court as factual sources? If the Court were to look exclusively within the four

corners of the Complaint to determine whether Waterfield Group was Plaintiff's employer,

Defendant would be entitled to dismissal. The Complaint simply asserts, without elaboration,

that "Waterfield Group was the employer of Plaintiff within the meaning of the [MWPCL]."

Compl. ¶ 8. This is nothing more than "[t]hreadbare recitals of the elements of a cause of action," which is inadequate under modern interpretations of Rule 12(b)(6). *Iqbal*, 129 S. Ct. at 1949.

However, Plaintiff has supplemented this barebones pronouncement in several documents: the Agreement, which is attached to the Complaint; the Severance Release, which is attached to Plaintiff's opposition to Defendant's motion to dismiss; and facts included within Plaintiff's opposition memorandum, which Plaintiff offers to incorporate into an amended version of the Complaint if necessary.

There is no question that facts contained in the Agreement may be considered, as it is attached to and therefore "part of" the Complaint. *Talley v. Farrell*, 156 F. Supp. 2d 534, 539 (D. Md. 2001). However, the propriety of considering facts from the other two documents is less clear, because they are not part of the Complaint. Ordinarily, when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

However, neither Party has requested that Waterfield Group's motion be converted into a motion for summary judgment. Instead, Plaintiff has requested the opportunity to include the facts in an amended version of the Complaint. When a party requests leave to amend, the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Given the liberal pleading regime of the Federal Rules and the circumstances presented in this case, leave should be granted unless the proposed amendments are "'futile.'" *E.g.*, *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)). Amendments are futile if they "could not withstand a motion to dismiss." *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995).

Even though Waterfield Group is correct that Plaintiff has not technically filed a motion

for leave to amend,[1] Plaintiff has proffered the facts that he wishes to include within such an

amended complaint. If the Court were to follow Waterfield Group's line of reasoning, it would

have to go through the following unnecessary procedural technicalities: adjudicate Waterfield

Group's motion with respect to the Complaint in its present form, likely resulting in dismissal

without prejudice to Plaintiff's right to propose amendments to cure the deficiencies; wait for

Plaintiff to file its amended complaint; wait for Waterfield Group to renew its motion to dismiss;

and, finally, resolve the 12(b) motions and move the case into discovery.

The far more expedient approach, however, is to consider all of the facts currently

presented, regardless of whether they were originally included in the Complaint or promised as

future amendments to the Complaint. This approach depends on Plaintiff holding up his end of

the bargain: if Defendant's motion is denied (as it will be), Plaintiff must amend the Complaint

to include the facts previously promised, or potentially risk dismissal.

Moving to the merits of Defendant's motion, Plaintiff presents two reasons why

Waterfield Group should be viewed as his employer. His first theory is based on the integrated-

employer test, under which a parent company can be held liable for the actions of its subsidiaries

in "extraordinary circumstances" when it "'exercises a degree of control that exceeds the control

normally exercised by a parent corporation.'" *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 981

(4th Cir. 1987) (quoting *Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir. 1983)).[2]

---

[1] Defendant rightly points out that Plaintiff has not yet filed a motion for leave to amend that complies with the
Local Rules of the Court. *See* Loc. R. 103(6) (D. Md. 2010). Nothing in this opinion suggests that Plaintiff is exempt
from these requirements. Indeed, Plaintiff will be directed to file a proposed amended complaint, in compliance with
Local Rules 103(6), within fourteen days.
[2] The factors courts consider in determining whether two entities count as a single employer under the integrated-
employer test include: "(1) common management; (2) interrelation between operations; (3) centralized control of
labor relations; and (4) degree of common ownership/financial control." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442
(4th Cir. 1999).

However, the Court holds that the integrated-employer doctrine does not apply to claims arising under the MWPCL. The theory was developed in the context of federal labor and civil-rights statutes, *see Thomas v. Bet Sound-Stage Restaurant/BrettCo, Inc.*, 61 F. Supp. 2d 448, 455-56 (D. Md. 1999), and there are no reported cases in which Maryland courts have applied its framework when defining the meaning of "employer" under any Maryland labor or wage statute.

Furthermore, the principles that undergird the integrated-employer test are in serious tension with fundamental principles of Maryland corporate law. Specifically, federal courts treat the integrated-employer doctrine as an exception to the general rule that shareholders (including parent corporations that own a subsidiary corporation) are not liable for the wrongful actions of the corporations in which they own shares. In the language of corporate law, the integrated-employer doctrine, when it applies, provides a rationale for piercing the corporate veil. *See, e.g.*, *Johnson*, 814 F.2d at 980-82 (summarizing the principles of limited liability, corporate veil piercing, and integrated enterprise).

However, "Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil." *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 728 A.2d 783, 790-91 (Md. Ct. Spec. App. 1999). Under Maryland law, the only exception to limited liability is in cases where the corporate form has been used by a shareholder to perpetrate fraud. *See, e.g.*, *id.* at 789 ("Despite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged a piercing of the veil 'for reasons other than fraud' have failed in Maryland courts."). Thus, the Court declines to utilize the federal integrated-employer concept for the interpretation of Maryland statutes.

Instead, the Court will apply the test that Maryland courts have used for determining the meaning of "employer" under the MWCPL. The statute itself provides little guidance: an

11

"[e]mployer" is defined as "any person who employs an individual in the State or a successor of the person." MWCPL § 3-501(b). Maryland courts have recently interpreted section 3-501(b) in light of common-law principles of employment, holding that "'[t]he decisive test in determining the existence of an employer-employee relationship is the right of the employer to control and direct the employee in the performance of the work and in the manner in which the work is to be done.'" *Mohiuddin v. Doctors Billing & Mgmt. Solutions, Inc.*, 9 A.3d 859, 863-64 (Md. Ct. Spec. App. 2010) (quoting *Auto. Trade Ass'n v. Harold Folk Enters.*, 484 A.2d 612, 621 (Md. 1984)).

*Mohiuddin* did not elaborate more specifically on how courts ought to apply this test. Nevertheless, the central case *Mohiuddin* relies upon, *Automobile Trade Association*, provides five factors that tend to show that an entity is an employer: "'(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer.'" 484 A.2d at 620 (quoting *Mackall v. Zayre Corp.*, 443 A.2d 98, 103 (Md. 1982)).

The first factor, power to select and hire, favors Defendant. The Employment Agreement appears to be a contract between Plaintiff and the Bank, and Plaintiff has not alleged any facts suggesting that Waterfield Group was involved in the decision to hire Plaintiff.

However, the other factors are either ambiguous or potentially favorable to Plaintiff. Several of Plaintiff's allegations bear upon the second factor, payment of wages: Waterfield Group cut his paychecks; Plaintiff was authorized under the Agreement to participate in Waterfield Group's Stock Option Plan, but only subject to the approval of its Board of Directors; and the Severance Release suggests that Waterfield Group may have called the shots regarding whether to give Plaintiff his severance payment.

Regarding the third factor, power to discharge, Plaintiff alleges that Waterfield Group was responsible for the constructive termination of his job.[3] The Complaint avers that a high-level decision was made to close new mortgage lending at the Bethesda office of the Bank, and that those functions were transferred to Waterfield Group's central office in Irvine, CA. Additionally, the Severance Release strongly suggests that Waterfield Group had considerable power over the circumstances of Plaintiff's termination, and that Waterfield Group viewed Plaintiff as its employee.

The record is less well-developed on the fourth and fifth factors: whether the employer has power to control employee's conduct and whether the work is part of the regular business of the employer. Still, there are strands of facts that support Plaintiff's position as to these factors. The Agreement indicates that Plaintiff's employment will be subject to various policies and guidelines of Waterfield Group, though nothing in the record clarifies the nature or extent of these policies. Furthermore, Plaintiff's allegation that he often collaborated closely with Waterfield Group's Irvine office on projects and client contacts provides some basis for inferring that his work was part of Waterfield Group's regular business.

At the motion-to-dismiss stage, it is not the Court's role to make a final judgment as to the factual merit of Plaintiff's case. Plaintiff's burden at this juncture is merely to provide enough detail to "nudge[] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. For the reasons stated above, Plaintiff has presented enough to allow his claim that Waterfield Group is his employer to proceed into discovery. Therefore, Waterfield Group's motion must be denied.

---

[3] The Court assumes, without holding, that Plaintiff has presented adequate facts to support a finding that he was constructively terminated prior to the expiration of his severance entitlement. Waterfield Group's motion has not called into question Plaintiff's position on that issue, so it is not before the Court.

**IV.    CONCLUSION**

For the foregoing reasons, FDIC's motion will be granted and Waterfield Group's motion will be denied. A separate order will follow.

   June 27, 2011                                         /s/
       Date                                         Alexander Williams, Jr.
                                                   United States District Judge