**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

-------------------------------------------------------X
                                                      :
MALCOLM HOLLENSTEINER,                                :
                                                      :
                                    Plaintiff,        :          Case No. 8:10-cv-00200 (AW)
                                                      :
            - against -                               :
                                                      :          **SECOND AMENDED**
WATERFIELD GROUP; FEDERAL                             :          **COMPLAINT**
DEPOSIT INSURANCE CORPORATION                         :
(FDIC), as receiver for WATERFIELD                    :
BANK,                                                 :
                                                      :
                                    Defendants.       :          **JURY TRIAL DEMANDED**
-------------------------------------------------------X

### AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Malcolm Hollensteiner ("Plaintiff"), by and through his undersigned attorneys, as and for his Second Amended Complaint against Defendants Waterfield Group (a/k/a and/or d/b/a "Affinity") and the Federal Deposit Insurance Corporation ("FDIC"), as receiver for Waterfield Bank (the "Bank") (collectively and together, "Defendants"), hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is an action to recover unpaid wages, interest, treble damages, attorneys' fees, and costs under the Maryland Wage Payment and Collection Act, Md. Code Lab. & Empl. § 3-501, *et seq.*, as well as to recover damages for breach of an employment contract, for promissory estoppel and for quantum meruit

2.      Defendants secured and retained Plaintiff's employment through material representations concerning their payment to him of certain compensation based upon the value of

(a) Plaintiff's skills and experience, (b) Plaintiff's individual contribution and (c) the performance of Plaintiff's division and the Bank overall.

3.      Plaintiff executed a valid and enforceable employment contract with Affinity and the Bank dated July 23, 2008 (the "Employment Agreement").

4.      By failing to pay Plaintiff this promised compensation, and by subsequently terminating Plaintiff's employment without paying him severance amounts owed under the terms of his Employment Agreement, Defendants have breached the Employment Agreement with Plaintiff and have violated the Maryland Wage Payment and Collection Act, which has caused and continues to cause Plaintiff substantial damages.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between Plaintiff and all Defendants.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in the District of Maryland and because Defendants regularly transacted business in this district, such that they are subject to personal jurisdiction in this district.

## PARTIES

7.      Plaintiff Malcolm Hollensteiner resides in Bethesda, Maryland, and was employed as a Senior Vice President & Manager – Retail Mortgage Banking at the Bank's now defunct office in Bethesda, Maryland until July 16, 2009.

8.      Defendant Waterfield Group is an Indiana corporation, with its principal place of business in Irvine, California.  At all times relevant to this action, Defendant Waterfield Group

was the employer of Plaintiff within the meaning of the Maryland Wage Payment and Collection Act.

9.      Defendant Waterfield Bank is an Indiana corporation, with its principal place of business in Irvine, California.  The Bank also has offices in Germantown, Maryland and a branch in Carmel, Indiana.  Until July 16, 2009, the Bank also had an office in Bethesda, Maryland.  At all times relevant to this action, Defendant Waterfield Bank was a fully-owned subsidiary of Affinity and the employer of Plaintiff within the meaning of the Maryland Wage Payment and Collection Act.

10.      Upon information and belief, Affinity purchased the Bank in 2008 in order to integrate the Bank into its private-label banking services and hoped to grow the Bank to become the place where Affinity put the majority of its deposits.  During all relevant times, Affinity and the Bank shared members of their respective Boards of Directors and the Bank President worked exclusively from Affinity's Irvine offices where he ran Plaintiff's former branch.  Additionally, Affinity handled payroll for the Bank and all of Plaintiff's paychecks were drawn by Affinity and mailed from Affinity's office in Irvine, CA.

## FACTUAL ALLEGATIONS

**Plaintiff's Acceptance of Employment Pursuant to the Employment Agreement**

11.      Prior to joining the Bank in August 2008, Plaintiff enjoyed a successful position of employment with a leading mortgage bank.  While working there, Plaintiff earned substantial annual compensation in a senior executive role.  Plaintiff also enjoyed generous benefits, such as stock options and annual bonus payments during that prior employment.

12.      In or around July 2008, during his prior employment, Plaintiff was approached for an opportunity to run Affinity's retail mortgage loan business at the Bank's Bethesda, Maryland

office.  Plaintiff was promised that, in this role, his primary responsibility would be to manage all aspects of new retail mortgage loans.  This typically involved developing retail mortgage loan packages, arranging prospective deals, pricing new loans and analyzing competitive strategies within the market.

13.     Additionally, as part of the offer, Defendants promised Plaintiff an employment contract, guaranteeing a number of attractive compensation terms.

14.     Plaintiff, enticed by the opportunity to run a retail mortgage loan business, as well as by the security and benefits of an employment contract, began negotiating with Defendants.

15.     After weeks of negotiation, on or about July 23, 2008, Plaintiff and Defendants executed the Employment Agreement and Plaintiff promptly resigned from his prior employer to begin employment with Defendants.  Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Employment Agreement with Defendants.

16.     Pursuant to the terms of the Employment Agreement, for the first six months of employment, Plaintiff was entitled to the greater of (1) base compensation equal to $30,000 monthly, or (2) base compensation (based on an annual salary of $150,000) plus override commissions or profit sharing.  The total minimum compensation for Plaintiff's first six months of employment was $180,000.  *See* Ex. A, ¶ 3.

17.     The override commissions were a benefit payable to Plaintiff until he met the requirements for profit sharing participation.

18.     After the first six months of employment, Plaintiff was entitled to the greater of (1) base compensation equal to $150,000 annually plus override commissions, or (2) base compensation equal to $150,000 annually plus profit sharing.  *Id.*

19.     The profit sharing requirements were set forth in a separate plan, and generally equaled 65% of profits in excess of a 15% after tax return on equity.

20.     The Employment Agreement also guaranteed that upon termination without cause, Plaintiff would receive a severance payment equal to "the greater of either i) the average of the annual Base Compensation, Override Commissions and Profit Sharing paid from the Effective Date to the date of termination . . . or ii) $300,000."  Ex. A, ¶ 5.  This severance obligation expired one year after the start of Plaintiff's employment at the Bank, or an August 6, 2009 expiration.

21.     The Employment Agreement expressly guaranteed that, "in all events [Plaintiff's] position shall be consistent with a senior level executive of the Bank."  Ex. A, ¶ 1.

22.     In addition, the Employment Agreement provided that:

    a.  Plaintiff would receive stock options only after the approval of the Affinity Board of Directors (Ex. A, ¶ 4);

    b.  Plaintiff would be allowed to participate in all of Affinity's pension plans (Ex. A, ¶ 6); and

    c.  Plaintiff must work in the best interests of both Affinity and the Bank. (Ex. A, ¶ 9)

23.     Relying on the promises contained therein, Plaintiff executed the Employment Agreement and began working at the Bank.  Plaintiff's first date of employment was on August 5, 2008.

**Plaintiff's Job Duties and Responsibilities as Senior Vice President**

24.     As the director of the retail mortgage loan business, Plaintiff's principal job duty was management of a division of retail mortgage loan officers, including recruiting new loan officers, training them and overseeing their profitability.

25.     In addition, Plaintiff worked closely with other executive level employees to develop strategies regarding the expansion of the retail mortgage loan business.  In developing these strategies, Plaintiff worked closely with, and at the direction of, Affinity's corporate office in Irvine, CA, including constant conversations with Affinity and numerous meetings in Irvine. Affinity further directed Plaintiff on how to grow the Bank's business by partnering with Affinity clients.

26.     During the first eight months of his employment, Plaintiff devised and implemented a plan to open four new mortgage branches and to recruit new talent for those branches.  These new branches included Washington D.C., Fairfax, Virginia, Fredericksburg, Virginia, and Warrington, Virginia.  The Affinity Board of Directors pushed expansion in this area as a primary vehicle of growth and encouraged Plaintiff's efforts at expanding in this manner.

27.     Until July 2009, all of Plaintiff's duties and responsibilities were equivalent with those of a senior level executive.

28.     In fact, members of his operations staff and/or administrative team completed whatever non-managerial duties that Plaintiff needed accomplished.

29.     Consistent with the Employment Agreement, at no point prior to July 2009, was Plaintiff tasked with performing administrative or operational duties.

**Defendants' Failure to Provide a Profit Sharing Plan and Make Required Profit Sharing Payments to Plaintiff**

30.     The Employment Agreement required the Bank to "use its best efforts to provide a formal written incentive plan, consistent with the agreed pro forma projections for Retail Mortgage Banking, regarding Profit Sharing . . . within 90 days of the Effective Date."  Ex. A, ¶ 3.

31.     Despite Defendants' repeated promises and the terms of the Employment Agreement itself, Plaintiff never received a profit sharing plan from Defendants.  Their failure to provide Plaintiff with a profit sharing plan violated the Employment Agreement.

32.     Further, despite Defendants' repeated promises and the terms of the Employment Agreement itself, Plaintiff likewise never received any profit sharing payments from Defendants during his employment.  Their failure to make any profit sharing payments to Plaintiff violated both the Employment Agreement and the Maryland Wage Payment and Collection Act.

**The Shut Down of Mortgage Loan Operations and Termination of Plaintiff's Employment**

33.     On July 16, 2009, Defendants issued a written notice to employees, informing them of their decision to stop the production of new mortgage loans in the East and Southeast lending offices and to move these functions to Affinity's corporate office in Irvine, California.

34.     On this very same day, Defendants mandated that Plaintiff not take on any new mortgages and that he instruct all employees under his management similarly.

35.     Because Plaintiff and all of the employees he managed were prohibited from originating new loans, Plaintiff had no job duties left to perform.

36.     Specifically, Plaintiff was no longer involved with developing retail mortgage loan packages, analyzing competitive strategies within the market, recruiting new loan officers and/or managing employees.   Not only were such duties no longer required, but Plaintiff was specifically prohibited from performing any of them.

37.     Soon after the July 16, 2009 closure notice, Defendants formally notified all loan originators, all of whom were supervised by Plaintiff, of the termination of their employment. Upon information and belief, none of these loan originators had an employment contract or a severance entitlement.

38.     At this point, Plaintiff had no employees left to manage, and clearly was no longer involved with recruiting new talent for the new branches Defendants had planned to open or otherwise engaged in performing the duties of a Senior Vice President of Retail Mortgage Banking.  With no duties left to perform for Defendants, Plaintiff was effectively terminated upon this notice of closure.

39.     Despite stripping Plaintiff of all meaningful job duties and prohibiting him from originating any new mortgages, which made up the basis for much of his compensation, Defendants delayed providing Plaintiff with a formal termination notice in an attempt to evade their obligation to make Plaintiff's required severance payment, which was set to expire on August 6, 2009.

40.     As soon as Plaintiff advised Defendants of his belief that he had been terminated and asked for an update on the status of his expected severance payment, Defendants attempted to change the terms and conditions of his employment by purporting to give him all new duties that were administrative in nature to create a façade of continued employment.

41.     Plaintiff was given only clerical duties to perform, and even those were sporadic, minimal and infrequent in nature, and these newly assigned "duties" were not consistent with those performed by a "senior level executive of the Bank," as required by his Employment Agreement.  *See* Ex. A, ¶ 1.

42.     By way of example only, Defendants required Plaintiff to handle administrative-level tasks, such as cancelling parking contracts for terminated employees and arranging movers to collect office furniture.  Apart from these minimal tasks, Plaintiff had no substantive job responsibilities to perform after the July 16, 2009 closure notice.

43.     Defendants' strategy toward Plaintiff was nothing more than a thinly veiled attempt to force Plaintiff to leave his employment voluntarily, which would forfeit his entitlement to severance under the Employment Agreement, or to create a pretextual basis to argue that Plaintiff was not "terminated" until after his severance entitlement expired on August 6, 2009.

44.     Plaintiff's Employment Agreement required that he stay on after notice of termination and cooperate with Defendants in order to receive his severance entitlement.  *See* Ex. A, ¶ 5(a).

45.     Based on this requirement, Plaintiff fully cooperated with Defendants with a good faith expectation that they would pay him his contractual severance.

46.     At no point during Plaintiff's period of cooperation, and after his effective termination, did Defendants indicate that it would not honor Plaintiff's contractual severance entitlement.

47.     Finally, on September 1, 2009, after Plaintiff learned that Defendants in fact would not honor its severance obligation under the Employment Agreement, Plaintiff advised Defendants that they had terminated his employment effective July 16, 2009, and were required to pay his full severance entitlement under the Employment Agreement.

48.     Following Plaintiff's termination, Affinity offered Plaintiff a severance package far below what he was entitled to under the Employment Agreement.   Attached hereto as Exhibit B is a true and correct copy of the Severance Agreement and General Release (the "Severance and Release") offered to Plaintiff by Affinity.

49.     The Severance and Release was mailed to Plaintiff by Affinity from its offices in Irvine, California.

50.     Pursuant to the Severance and Release, Plaintiff's *employment with Affinity* was scheduled to terminate on September 25, 2009. (emphasis added).  Ex. B, ¶ 2.

51.     Further, the Severance and Release required Plaintiff to release Affinity from all potential claims against it "[a]rising from or in any way connected with the *employment relationship between the parties*, any action during the relationship, and/or termination thereof, including, but not limited to, all 'wrongful discharge' claims; and all claims relating to any contract of employment, express or implied." (emphasis added). Ex. B., ¶ 3.

52.     Additionally, the Severance and Release called for Affinity to pay all of Plaintiff's compensation due, as well as make a severance payment to Plaintiff, upon the signing of the Severance and Release.  Ex. B, ¶¶ 2-3.

53.     Despite Plaintiff's good faith efforts to collect such wage payments, Defendants have refused to pay Plaintiff either his full severance or his profit sharing payments.

## FIRST CAUSE OF ACTION

### (Violation of the Maryland Wage Payment and Collection Act Based on Failure to Pay Earned Profit Sharing Payments)

54.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-53 above as if set forth fully herein.

55.     Pursuant to Md. Code Ann., Lab. & Empl. §§ 3-501 et seq., employers such as Defendants must pay an employee all wages due for work that the employee performed before the termination of employment.

56.     Section 3-505 requires that this payment is made on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

57.     Defendants failed to pay Plaintiff his earned profit sharing payments, which constitute wages under the Maryland Wage Payment and Collection Act.

58.     Indeed, at no time during his employment did Plaintiff receive a profit sharing payment, despite the fact that he had earned such payments and such payments were due to him under the terms of his Employment Agreement.

59.     Defendants failed to pay Plaintiff these wages willfully and in bad faith, and not as a result of any bona fide dispute.

60.     By failing to compensate Plaintiff for his earned profit sharing payments, Defendants have violated the Maryland Wage Payment and Collection Act.

61.     Pursuant to Md. Code Ann., Lab. & Empl. § 3-507.1, Plaintiff seeks his unpaid wages, interest, treble damages, reasonable counsel fees and costs, and any other relief deemed appropriate by the Court.

## SECOND CAUSE OF ACTION

### (Violation of the Maryland Wage Payment and Collection Act Based on Failure to Pay Severance Payments)

62.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-61 above as if set forth fully herein.

63.     Pursuant to Md. Code Ann., Lab. & Empl. §§ 3-501 et seq., employers such as Defendants must pay an employee all wages due for work that the employee performed before the termination of employment.

64.     Section 3-505 requires that this payment is made on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

65.     Defendants failed to pay Plaintiff his required severance payment, which constitutes wages under the Maryland Wage Payment and Collection Act.

66.     Defendants failed to pay Plaintiff these wages willfully and in bad faith, and not as a result of any bona fide dispute.

67.     By failing to compensate Plaintiff for his earned severance payment, Defendants have violated the Maryland Wage Payment and Collection Act.

68.     Pursuant to Md. Code Ann., Lab. & Empl. § 3-507.1, Plaintiff seeks his unpaid wages, interest, treble damages, reasonable counsel fees and costs, and any other relief deemed appropriate by the Court.

## THIRD CAUSE OF ACTION

### (Breach of Contract)

69.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-68 above as if set forth fully herein.

70.     Defendants offered, and Plaintiff accepted, employment on specific terms that were formalized in Plaintiff's Employment Agreement with Defendants.

71.     After Defendants and Plaintiff reached agreement on a final contract, the terms of which were memorialized in writing and signed by an authorized representative of Defendants, Plaintiff commenced employment with Defendants.

72.     Defendants breached the terms of their Employment Agreement with Plaintiff (a) by failing to pay Plaintiff the amounts promised under the contract, (b) by failing to provide Plaintiff with a profit sharing plan to attempt to cover up their failure to pay him such compensation, and (c) by changing his job duties and responsibilities to administrative tasks that were not consistent with those of a senior level executive of the Bank.

73.     As a direct consequence of Defendants' breach of Plaintiff's Employment Agreement, Plaintiff has suffered, and continues to suffer, substantial injury including the loss of profit sharing payments and severance payments that were required to have been made to him under the Employment Agreement.

74.     Defendants are liable to Plaintiff for all damages that Plaintiff has sustained as a result of Defendants' breach of contract.

## FOURTH CAUSE OF ACTION

### (Promissory Estoppel)

75.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-74 above as if set forth fully herein.

76.     As part of Defendants' effort to induce Plaintiff to resign from a stable and financially rewarding position with his previous employer, Defendants and/or individuals authorized to act on behalf of Defendants promised Plaintiff certain terms and conditions of employment.

77.     Foremost among those promised terms and conditions, which were subsequently memorialized in the Employment Agreement, were profit sharing, a severance payment, and a promise that at all times Plaintiff's job duties would be consistent with those performed by a senior level executive.

78.     Plaintiff reasonably and foreseeably relied upon these promises to his detriment when he resigned from his previous employer.

79.     Based upon Plaintiff's reasonable and foreseeable, detrimental reliance upon these promises, Defendants are estopped from not paying Plaintiff the required profit sharing and severance payments set forth in the Employment Agreement.

80.     On or about July 16, 2009, Defendants willfully, and without cause or notice, terminated Plaintiff's employment without compensating him as required by the terms of his Employment Agreement, resulting in a gross injustice to Plaintiff.

81.     Throughout Plaintiff's employment, Defendants received the substantial benefit of Plaintiff's valuable employment services without compensating him as required by the terms of his Employment Agreement, resulting in a gross injustice to Plaintiff.

82.     As a direct result of Plaintiff's reasonable and foreseeable reliance upon the promises set forth in the Employment Agreement, Plaintiff has suffered, and continues to suffer, substantial damages, including the loss of profit sharing payments and severance payments due to Defendants' refusal to honor their promises to Plaintiff.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment/Quantum Meruit)

83.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-82 above with the same force and effect as though fully set forth herein.

84.     As part of the Bank's effort to induce Plaintiff to resign from a stable and financially rewarding position with his previous employer, and to retain Plaintiff's services throughout his tenure at the Bank, Defendants promised Plaintiff on several occasions that in addition to his base salary, he would be paid profit sharing payments and, upon termination, a severance payment.

85.     During his employment, Plaintiff performed his services diligently and in good faith and fulfilled all of his obligations under the terms of his Employment Agreement.  Defendants readily accepted the benefits of Plaintiff's employment.

86.     Based on the specific promises made to Plaintiff regarding the compensation he would receive, Plaintiff had a reasonable expectation that he would be compensated for his services in accordance with the terms of his Employment Agreement.

87.     Despite the fact that Plaintiff's Employment Agreement entitled him to profit sharing payments and Defendants accepted the benefits of Plaintiff's services under the Employment Agreement, Defendants never provided Plaintiff with such payments.

88.     Despite the fact that Plaintiff's Employment Agreement entitled him to a severance payment upon termination and Defendants accepted the benefits of Plaintiff's services under the Employment Agreement, Defendants never provided Plaintiff with the required severance payment.

89.     Defendants' acceptance of the full benefit of Plaintiff's services under the Employment Agreement without fulfilling their own promises to Plaintiff results in a gross injustice to Plaintiff.

90.     As a direct result, Plaintiff has suffered, and continues to suffer, substantial damages including the loss of profit sharing payments and severance payments to which he is entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

a.   A declaratory judgment that Defendants violated Plaintiff's rights under the Maryland Wage Payment and Collection Act;

b.   A declaratory judgment that Defendants breached Plaintiff's Employment Agreement and committed the alleged torts against Plaintiff;

c.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for his unpaid profit sharing payments and severance payments, plus treble damages under the Maryland Wage Payment and Collection Act;

d.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for the damages he sustained as a result of Defendants' breach of contract and alleged torts against Plaintiff;

e.   An award of damages for any and all other losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

f.   An award of punitive damages;

g.   An award of costs that Plaintiff incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

h.   Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

DATED:                              **THOMPSON WIGDOR LLP**
September 16, 2011

By: _____/s/_____
      Basil C. Sitaras (*pro hac vice*)

      85 Fifth Avenue
      New York, NY 10003
      Telephone: (212) 257-6800
      Facsimile: (212) 257-6845

      *ATTORNEYS FOR PLAINTIFF*